IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

At Clarksburg

ELECTRONICALLY
FILED
Apr 30 2024
U.S. DISTRICT COURT
Northern District of WV

**ROBERT A. MARSH**,

　　　　Plaintiff,

v.                                    Civil Action No. _____**1:24-CV-48 (Kleeh)**_____

**J. R. GARRETT**, individually as a member
of the West Virginia State Police;
**A. JORDAN**, individually as a Braxton County
Deputy Sheriff;
**L. JOHNSON**, individually as a Braxton County
Deputy Sheriff; and
**A. GROVES**, individually as a Braxton County
Deputy Sheriff,

　　　　Defendants.

## COMPLAINT

For his **COMPLAINT** against Defendants J. R. Garrett, A. Jordan, L. Johnson, and A. Groves, Plaintiff Robert A. Marsh states the following:

### Jurisdiction

1.　　This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1334 and under the Court's authority to decide pendent state law claims.

2.　　Plaintiff files this **COMPLAINT**, pursuant to 42 U.S.C. §1983, alleging violations of his constitutional rights. Specifically, Plaintiff alleges that his rights under the Fourth, Eighth, and Fourteenth Amendment to the United States Constitution were violated by Defendants when Defendants used excessive and wrongful force during the course of arresting Plaintiff on or about September 17, 2022.

**Parties**

3.      Plaintiff Robert A. Marsh at all times relevant to this **COMPLAINT** was a resident of Braxton County, West Virginia.

4.      Defendant J. R. Garrett at all times relevant to this **COMPLAINT** is a member of the West Virginia State Police.  At all times alleged herein, Defendant J. R. Garrett was acting under color of law and within the scope of his employment.  Defendant J. R. Garrett is sued only in his individual capacity.

5.      Defendant A. Jordan at all times relevant to this **COMPLAINT** is a Braxton County Deputy Sheriff.  At all times alleged herein, Defendant A. Jordan was acting under color of law and within the scope of his employment.  Defendant A. Jordan is sued only in his individual capacity.

6.      Defendant L. Johnson at all times relevant to this **COMPLAINT** is a Braxton County Deputy Sheriff.  At all times alleged herein, Defendant L. Johnson was acting under color of law and within the scope of his employment.  Defendant L. Johnson is sued only in his individual capacity.

7.      Defendant A. Groves at all times relevant to this **COMPLAINT** is a Braxton County Deputy Sheriff.  At all times alleged herein, Defendant A. Groves  was acting under color of law and within the scope of his employment.  Defendant A. Groves is sued only in his individual capacity.

8.      Defendant J. R. Garrett is sued up to the limits of the insurance policy which provides liability coverage for his actions and inactions.

2

9.      During the beating, kicking, stomping, and punching endured by Plaintiff at the hands, fists, and legs of Defendants, one or more of Defendants either was involved in the physical beating or watching the unreasonable force, without taking any action to intervene.  In this **COMPLAINT**, the word "Defendants" often will be used collectively to describe the involvement of one or more of these Defendants either in the physical beating of Plaintiff or in the failure to intervene to prevent the other Defendants from injuring Plaintiff.

**Facts**

10.     Some time in June, 2022, Plaintiff began speaking with Christina Baker when he would see her either at the  Rabbit Star Bar in Sutton, Braxton County, West Virginia or at some horse shows.

11.     Eventually, Plaintiff began dating Christina.

12.     Christina's ex-boyfriend was Tre Jordan, who is the brother of Defendant A. Jordan, a Braxton County Deputy Sheriff.

13.     One weekend in August, 2022, when Plaintiff went back to Ohio, he learned that while Christina and some of her friends were at the Rabbit Star Bar, Tre Jordan began harassing her in the bar and making her feel uncomfortable, causing her to leave.

14.     Her friends followed Christina home and stayed there until early in the morning to make sure she was safe.

15.     The following day Plaintiff learned that Tre Jordan had wrecked his truck into a barrier leaving the bar and was passed out drunk at the local GO-MART gas station.

16.     On September the 17, 2022, Christina and Plaintiff had spent the day preparing for a surprise birthday party for one of her best friends, Sophia.

17.     At that time, Sophia was dating Defendant A. Jordan, who did not attend the surprise party because he was working that night.

18.     Around 10:30 p.m., Plaintiff, Christina, and others decided to go to the Rabbit Star Bar in Sutton, West Virginia.

19.     The Rabbit Star Bar has a total of eight video cameras, some inside and some outside, as a part of its security system.

20.     The Bar is completely fenced in with a privacy fence and there is a smokers' room just outside of the main part of the Bar, leading to the pavilion and outside fire ring seating area.

21.     After finishing a beer, Plaintiff left the pavilion, walked through the smoker room, and entered the main bar area where Plaintiff saw Tre Jordan.

22.     Plaintiff walked up to Tre Jordan, tapped him lightly on his face, and asked him to go outside to talk.

23.     Tre Jordan declined the talk and while Plaintiff was trying to convince him to go outside, another person grabbed Plaintiff and started holding him back.

24.     Plaintiff became upset, got loud, and was pushed out the front door and into the parking lot.

25.     Several people who saw what had happened told Plaintiff that the police already were on their way.

26. At that point, Plaintiff began walking down the road away from the Bar and headed toward an apartment complex.

27. When Plaintiff realized he did not have his cell phone, he headed back to the Bar.

28. After looking over the fence surrounding the bar, Plaintiff saw Tre Jordan in the parking lot, decided to go over the fence, and told Tre Jordan he was coming after him.

29. Soon after clearing the fence and approaching Tre Jordan, Plaintiff was hit once by someone he did not see.

30. The blow knocked Plaintiff unconscious and later Plaintiff learned that he had been hit by a person named Levi Jarvis, who is a friend of Tre Jordan's.

31. When Plaintiff regained consciousness, Plaintiff saw standing over him a State Trooper and two Braxton County Deputy Sheriffs.

32. Based upon the investigation conducted, Plaintiff learned Defendant J. R. Garrett was the State Trooper and Defendant A. Jordan, Tre Jordan's brother, and Defendant L. Johnson were the Deputy Sheriffs present.

33. A video taken by a customer of the bar shows Defendant A. Jordan coming over the fence and as he approaches Plaintiff, he turns on his flashlight and directs it at Plaintiff.

34. At that time, Plaintiff was lying on the ground on his left side.

35. One of the officers moves Plaintiff over on his back, with both of his arms spread out away from his body while one of the officers told the crowd to clear out.

36. Defendant J. R. Garrett then began standing on Plaintiff's right arm.

5

37.    After Plaintiff appears to be conscious and raises his head, the officers pulled Plaintiff's right arm over toward the fence so that Plaintiff was positioned on his hands and knees.  The video also shows Defendant J. R. Garrett driving his right knee into Plaintiff's back, forcing his full weight on Plaintiff's ribs.

38.    There is no blood or other injury to Defendant's face nor was there any blood on his white t-shirt visible from this video.  This video stops prior to handcuffs being placed on Plaintiff.

39.    Defendants ordered the Bar patrons to go inside the Bar and the two garage-type doors that lead out to the fire pit area were closed.  Once the patrons were inside the Bar and could not see outside and after Plaintiff was handcuffed behind his back, Defendants began physically assaulting him with their fists and kicking him.

40.    Plaintiff distinctly remembers excessive force being placed in his ribs and hearing his ribs crack when one of the officers drove his knee into Plaintiff's ribs.

41.    Plaintiff's face was in the stones of the parking lot when the assault occurred.  The photos of Plaintiff's injuries show multiple scratch marks on the left side of Plaintiff's face.

42.    Defendants repeatedly kicked Plaintiff in the face, stomach, and chest with their boots.

43.    Defendants also tased Plaintiff for what appeared to be a long time and Plaintiff was told repeatedly this is what happens when you mess with Tre Jordan's girl.

44.    Plaintiff begged for their mercy, said he would quit his job and return to Ohio, and would stop dating Christina.

45.     After some more kicks to Plaintiff's face, Defendants dragged Plaintiff behind the fence and out into the parking lot, in front of what Plaintiff believed was a police vehicle.

46.     At some point, Defendant J. R. Garrett poured water over Plaintiff's head to clean up some of the blood.  However, Plaintiff's face and ears were covered with blood by the time the emergency medical personnel began treating him.

47.     Once the ambulance arrived, Defendants removed the handcuffs and then handcuffed Plaintiff in front of his body so he could be placed on a stretcher.

48.     When he arrived at the Braxton County Memorial Hospital Emergency Room, Plaintiff was bleeding from his nose and mouth, was complaining of a headache, and his left eye was swollen.  The testing revealed Plaintiff had suffered extensive facial bone fractures.   The emergency room physician advised that due to the facial and rib injuries, Plaintiff needed to be transported that morning to Ruby Memorial Hospital in Morgantown.

49.     Additional testing at Ruby Memorial revealed Plaintiff had suffered multiple left rib fractures and bilateral LeFort Fractures in his face.

50.     On September 18, 2022, Defendant J. R. Garrett appeared before a Braxton County Magistrate and swore out criminal complaints against Plaintiff charging him with obstructing a police officer and disorderly conduct.

51.     However, later on that same date, the criminal charges against Plaintiff were dismissed without prejudice.

## PRE-SUIT INVESTIGATION

52.    On December 27, 2022, counsel for Plaintiff sent Freedom of Information requests
and preservation of evidence letters to Braxton County 911, Braxton County Sheriff,
and West Virginia State Police, seeking to obtain records relating to the beating
inflicted on Plaintiff on September 17, 2022, and requiring these entities to preserve
all records and evidence in their possession relating to this beating.

53.    In the **ORIGINAL NARRATIVE** attached to the arrest warrant provided by
Defendant J. R. Garrett, he states:

On Saturday, September 17th 2022, at approximately 2330 hours, the
undersigned officer received a 911 call for an active bar fight located
at the "Rabbit Star Bar" in Sutton, West Virginia. Upon arrival, the
undersigned officer was met by a male subject identified as, John
David Jordan III/ Victim. Speaking with the victim, he advised that
a male subject identified as, Richard A. Marsh/ Defendant had
grabbed him as well as "punching" the victim in the chest stating to
talk to him in the parking lot like a man. The victim further advised
that the defendant was the boyfriend of his recent ex-girlfriend. The
undersigned officer was advised that the defendant was told to leave
by the bar owner, which he complied. The victim advised that later,
the defendant returned and jumped over then fence to the bar and
began running towards the victim yelling he was going to kill the
victim. The defendant was located lying on the ground and was
advised to place his hands behind his back to be detained, which the
defendant refused and stiffened his arms to prevent the undersigned
officer from detaining him. The defendant was later taken to the
Braxton County Memorial Hospital where he was given a disorderly
conduct warning due to his drunken vulgar language in a public
setting, which he ignored and continued. These offenses occurred in
Braxton County, West Virginia.  At this time with the submission of
this report, this report is considered initial and pending follow up
investigation.

This narrative fails to describe what happened after Defendant J. R. Garrett saw
Plaintiff on the ground, but then had to be taken to the Braxton County Memorial
Hospital.

54.     On March 4, 2023, a few months **after** counsel for Plaintiff had sent a Freedom of Information request and preservation of evidence letter to the West Virginia State Police and several months **after** the criminal charges had been dismissed, for some unknown reason, Defendant J. R. Garrett drafted a **SUPPLEMENTAL NARRATIVE** regarding the events that occurred on September 17, 2022.  In this **SUPPLEMENTAL NARRATIVE**, Defendant J. R. Garrett provided the following:

On Saturday, September 17th 2022, at approximately 2300 hours, the undersigned officer along with Sgt. L. Johnson, Deputy A. Groves and Deputy A. Jordan received a call from Braxton 911 Communications regarding an active bar altercation located at the "Rabbit Star Bar" 625 Old Turnpike Road, in Sutton, West Virginia. Upon arrival, the undersigned officer was met by male subject identified as, John David Jordan III, who was later deemed the victim. While speaking with the victim, he advised that another male subject, who he identified as, Robert A. Marsh/ suspect had walked up behind him while sitting at the bar watching television and drinking a beer. The victim went on to state that the suspect spun him around and punched him in the chest and stated that he and the victim needed to go to the parking lot and talk. The victim stated that he told the suspect that he and the suspect had nothing to talk about then turned back around his chair. The victim stated that the suspect is his ex-girlfriend's new boyfriend. The victim stated the suspect again spun him around in his chair and told the victim to go to the parking lot. The victim again refused and spun back around, at which time the bar co-owner, Kathy Grogg ordered the suspect to leave the bar for the night, which the suspect complied.
After speaking with the victim, the undersigned officer began speaking with, Kath Grogg.  While speaking with, Mrs. Grogg, she advised that she noticed that the suspect was trying to talk to the victim, which the victim became confrontational with the suspect. Mrs. Grogg advised the suspect exited the bar and began walking down the road towards the town of Sutton.  Mrs. Grogg stated that the suspect disappeared into the dark yelling and screaming making a scene.
After speaking with Mrs. Grogg, the undersigned officer advised that he and the other officers on scene would patrol the area in effort to locate the suspect for his safety. While walking to the patrol vehicles, a loud commotion and screaming erupted to the rear of the bar. The undersigned officer was able to hear someone yelling "he's back".

After hearing such, the undersigned officer and Deputy A. Jordan ran to the right side of the building to the rear where the yelling was coming from. The undersigned officer and Deputy A. Jordan was unable to gain entry due to the privacy fence being too high. The undersigned officer boosted Deputy A. Jordan over the fence in effort to gain control of the situation. Several moments later, the undersigned officer was let in by, Mrs. Grogg, who had to run in the front door of the bar, to the rear of the bar, and finally open the latch to the privacy fence. Once inside, the undersigned officer observed the suspect lying on the ground on his back. The undersigned officer observed the suspect to be bleeding profusely from his facial area. The undersigned officer then heard the suspect begin to choke on his blood, and in turn the undersigned officer rolled the suspect over to his side to prevent any further choking.

While the suspect was on his side, the suspect began to regain consciousness and was ordered to go to this stomach to be detained. One handcuff was placed on the suspect and at which time, the suspect placed his arm under his body, refusing to give it to be placed in the other handcuff. Deputy A. Groves then removed his department issued taser and gave a warning arc to the suspect to gain compliance. The undersigned officer along with another deputy pulled the arm of the suspect free and was then able to fully detain the suspect. The undersigned officer then escorted the suspect to the front of the patrol vehicle to sit down and await emergency medical services (EMS). Prior to the arrival of (EMS), the undersigned officer obtained a bottle of water to assist the suspect by cleaning the blood from his eyes, in effort to help him see, while doing so, the undersigned officer was able to detect an immense odor of an alcoholic beverage emitting from the suspect. The undersigned officer was then able to observe the suspect to have a swollen eyebrow, busted lip and a swollen nose. As the suspect began speaking with the undersigned officer he repeatedly stated "man, I fucked up" "I just want to go home" "how much would it take to let me go home". When asked what had happened, the suspect advised that it was over his girl friend.

At approximately 2345 hours, the (EMS) crew arrived on scene and began giving medical attention to the suspect. The undersigned officer assisted the suspect the back of the EMS truck, where he was sat on a gurney to be loaded into the ambulance. While in the truck, the suspect continually repeated that he just "wanted to go home" "I fucked up". While in the ambulance, the emergency medical technician (EMT) Jessica Raynor had to combat the suspect from ripping off his medical leads that were attached to read his vital signs. The suspect made several attempts to get up off the medical cot but was verbally ordered to remain seated by the undersigned officer. The suspect finally calmed down and was then transported to the

[REDACTED] Hospital via ambulance.

While in the emergency room, the suspect began asking the undersigned officer "how much money would it take for me to just go home". The suspect again began to grow angry and curse at the nurses then repeatedly asked how much it would take for him to go home. Further into being booked into the emergency room, the suspect was asked by medical staff what had happened. The suspect advised that he was at the bar and fell off some beams and hit his head. The suspect was then taken to another medical room for further medical treatment such as scans for any internal injuries.

At approximately 0009 hours, the undersigned officer obtained a statement from the victim and was advised of what had occurred, in addition, was advised that a male subject identified as, Levi Jarvis struck the suspect in the face with a closed fist in effort to protect the victim.

At approximately 0443 hours, the undersigned officer observed the suspect being placed into another ambulance, which transported the suspect to [REDACTED] Hospital located in Morgantown, West Virginia. The undersigned officer and  Jordan followed the ambulance for safety precautions. Upon arriving at [REDACTED] hospital, the suspect was booked into the emergency room and secured.

At which time, both officers then returned to our respected county.

At approximately 1100 hours, the undersigned officer was given a copy of the court dismissal motion for all of the pending charges on the suspect, signed by the Braxton County Prosecutor.

On Friday, October 7th 2022, the undersigned officer began a follow up investigation regarding the incident. During the follow up, the undersigned officer spoke with the co-owner and owner Larry Grogg of the "Rabbit Star Bar". The owners allowed the undersigned officer into the establishment to further speak with them, inquired regarding any possible video surveillance and a daytime visual of the scene. Both owners advised there is video surveillance and was copied and agreed to give the copy to the undersigned officer as part of the investigation.

After speaking with the owners, the undersigned officer attempted to speak with an emergency room nurse that was in the room with the suspect, but she refused to make a statement due to fear of creating work related complications and wished to remain silent to the incident.

The undersigned officer spoke with another individual that had contact with the suspect, Jessica Raynor, the EMT on scene. She advised that she did have to struggle with the suspect to attempt to

provide medical treatment to the suspect. Mrs. Raynor advised that she was able to detect a strong odor of an alcoholic beverage emitting from his breath. She further advised that the suspect repeatedly stated that he just wanted to go home and that he got into a fight over a girl. Ms. Raynor advised that the suspect continuously begged to pay with money if he could just go home and pleaded to be let out of the ambulance.

On Friday, October 7th 2022, the undersigned officer met with the Star Bar co-owner, Mrs. Grogg to obtain a copy of the video surveillance. The undersigned officer was given a thumbdrive that held the video. Mrs. Grogg did advise that she had reviewed the video herself once the incident had occurred and was only able to observe the initial interaction between the suspect and Mr. Jordan III. She advised that it would be able to be seen that a large crowd begin to run outside during the incident, but the actual fight was not caught by video.

On a later date, the undersigned officer was able to make contact with, Levi Jarvis. A digital audio recording was obtained via recorder due to Mr. Jarvis working out of town. In the statement, Mr. Jarvis advised that as he walked into the Star Bar, he observed the suspect in the face of another patron.  Mr. Jarvis advised that he walked outback to play cornhole as the suspect was making a scene and was advised to leave. Mr. Jarvis advised that the suspect then jumped the back area fence and hit the ground and got up. Mr. Jarvis advised that is when he "hit" the suspect one (1) time. Mr. Jarvis advised that prior to hitting the suspect, the suspect began screaming "I'm gonna fucking kill you" towards the victim. Mr. Jarvis advised the suspect struck his head pretty hard as hit fell to the ground prior to the punch.  Mr. Jarvis advised after striking the suspect, he walked back inside and stayed.

At this time with the submission of this report, this report is considered supplemental and complete.

55. According to the dismissal motion signed September 18, 2022, by Braxton County Prosecuting Attorney Jasmine Morton, the ground asserted for seeking the dismissal of all criminal charges alleged against Plaintiff was that  "the Defendant is undergoing medical treatment."  This dismissal without prejudice motion was granted by the Magistrate.

56. In the documents produced by the West Virginia State Police in response to the FOIA request are copies of documents showing that in March and October, 2022, Defendant J. R. Garrett had reported that the fully charged battery for his Body Worn Camera sometimes would lose its charge before the end of a shift. Whether Defendant J. R. Garrett will claim that his Body Worn Camera lost its battery charge while Defendants were hitting and kicking Plaintiff when he was handcuffed and on the ground is not known at this time.

57. Video from the Body Worn Camera used by Defendant A. Jordan was produced and shows an interview he did with Ms. Grogg prior to Defendants beating and kicking Plaintiff after he was handcuffed. For most of this interview, Defendant A. Jordan covered the video camera, but the audio was recorded.

58. For reasons unknown at this time, the video recorded by Defendant A. Jordan's Body Worn Camera during the unreasonable force being inflicted on Plaintiff was not produced.

59. The recording from the Body Worn Camera worn by a State Trooper named Clark was produced. This recording was made after the assault of Plaintiff was over and Plaintiff was lying on the ground bleeding and handcuffed behind his back.

60. Video from the Body Worn Camera used by Defendant J. R. Garrett was produced where he interviewed one of the EMT's on or about October 7, 2022.

61. Video from the Body Worn Camera used by Defendant J. R. Garrett on or about October 7, 2022, when he interviewed Mr. and Mrs. Grogg was not produced, but counsel for Plaintiff was permitted to view it at the West Virginia State Police

13

Headquarters in South Charleston, West Virginia, where certain confidential or personal information was muted.

62.     According to information provided, the security videos from the Rabbit Star Bar produced allegedly did not capture Defendants using unreasonable force on Plaintiff.

## COUNT I

### *42 U.S.C. §1983*

63.     Plaintiff hereby realleges and incorporates by reference each and every allegation made in paragraphs 1 through 62 of this **COMPLAINT**.

64.     Defendants, while acting under color of law, violated Plaintiff's constitutional rights, resulting in permanent and debilitating injuries.

65.     The actions of Defendants violated the constitutional rights guaranteed to Plaintiff under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

66.     The actions of Defendants were not taken in good faith and were in violation of clearly established law.

67.     Some or all of these Defendants violated Plaintiff's constitutional rights, as described and identified herein, by using excessive and wrongful force during the course of arresting Plaintiff on or about September 17, 2022.

68.     Some or all of these Defendants also violated Plaintiff's constitutional rights, as described and identified herein, by failing to intercede and preventing the other Defendants from using excessive and wrongful force during the course of arresting Plaintiff on or about September 17, 2022.

69.    As a proximate result of Defendants' unconstitutional actions, Plaintiff seeks to recover damages to compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Permanent injuries;

D.    Past and future medical bills;

E.    Loss of earning capacity and lost wages;

F.    Scarring;

G.    Humiliation, embarrassment, and degradation;

H.    All other injuries proven by a preponderance of the evidence proximately caused by Defendants.

70.    In addition to these compensatory damages, Plaintiff also seeks to recover, under 42 U.S.C. §1988 the attorneys' fees and costs incurred during the course of this litigation.

71.    In an effort to prevent other similarly situated individuals from suffering the same violation of their constitutional rights, Plaintiff further seeks to have the Court order Defendants to undergo additional training and education addressing Defendants use of excessive and wrongful force, the development of policies to preclude such actions in the future, and the implementation of discipline against Defendants to hold them accountable for their wrongful actions.

72.    The actions of Defendants against Plaintiff were reprehensible, willful and wanton, malicious, objectively unreasonable, and in blatant and intentional disregard of the

15

rights owed to Plaintiff, thereby justifying an award of punitive damages against Defendants.

## COUNT II

### *CIVIL CONSPIRACY*

73.    Plaintiff hereby realleges and incorporates by reference each and every allegation made in paragraphs 1 through 72 of this **COMPLAINT**.

74.    As described more fully above, Defendants, while acting under color of law and within the scope of their employment, agreed among themselves to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

75.    As described more fully above, Defendants participated in and watched an open breach of the law, including the use of unreasonable force on Plaintiff, but did nothing to seek its prevention.  In this manner, the failure of one or more of Defendants to intervene to prevent the violation of Plaintiff's constitutional rights constituted a step taken in furtherance of a civil conspiracy to deprive Plaintiff of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

76.    In the manner described above, in furtherance of the conspiracy, each of Defendants engaged in and facilitated numerous over acts, including but not limited to those set forth above, and was an otherwise willful participant in joint activity.

77.    The actions of Defendants were not taken in good faith, were objectively unreasonable,  and were in violation of clearly established law.

78.     As a proximate result of Defendants' civil conspiracy, Plaintiff seeks to recover

damages to compensate him for:

A.      Physical pain and suffering, past and future;

B.      Mental pain and suffering, past and future;

C.      Permanent injuries;

D.      Past and future medical bills;

E.      Loss of earning capacity and lost wages;

F.      Scarring;

G.      Humiliation, embarrassment, and degradation;

H.      All other injuries proven by a preponderance of the evidence proximately

caused by Defendants.

79.     The actions of Defendants against Plaintiff were reprehensible, willful and wanton,

malicious, objectively unreasonable, and in blatant and intentional disregard of the

rights owed to Plaintiff, thereby justifying an award of punitive damages against

Defendants.

**COUNT III**

***BATTERY***

80.     Plaintiff hereby realleges and incorporates by reference each and every allegation

made in paragraphs 1 through 79 of this **COMPLAINT**.

81.     Defendants committed a battery upon the Plaintiff which proximately caused his

injuries.

82.    As a proximate result of Defendants' battery, Plaintiff seeks to recover damages to compensate him for:

A.    Physical pain and suffering, past and future;

B.    Mental pain and suffering, past and future;

C.    Permanent injuries;

D.    Past and future medical bills;

E.    Loss of earning capacity and lost wages;

F.    Scarring;

G.    Humiliation, embarrassment, and degradation;

H.    All other injuries proven by a preponderance of the evidence proximately caused by Defendants.

83.    The actions of Defendants against Plaintiff were reprehensible, willful and wanton, malicious, objectively unreasonable, and in blatant and intentional disregard of the rights owed to Plaintiff, thereby justifying an award of punitive damages against Defendants.

## COUNT IV

### *NEGLIGENCE*

84.    Plaintiff hereby realleges and incorporates by reference each and every allegation made in paragraphs 1 through 83 of this **COMPLAINT**.

85.    Defendants and agents and employees were negligent in the performance of their duties within the scope of their employment and such negligence was the proximate cause of Plaintiff's injuries.

86.     As a proximate result of Defendants' negligence, Plaintiff seeks to recover damages to compensate him for:

A.      Physical pain and suffering, past and future;

B.      Mental pain and suffering, past and future;

C.      Permanent injuries;

D.      Past and future medical bills;

E.      Loss of earning capacity and lost wages;

F.      Scarring;

G.      Humiliation, embarrassment, and degradation;

H.      All other injuries proven by a preponderance of the evidence proximately caused by Defendants.

87.     The actions of Defendants against Plaintiff were reprehensible, willful and wanton, malicious, objectively unreasonable, and in blatant and intentional disregard of the rights owed to Plaintiff, thereby justifying an award of punitive damages against Defendants.

## PRAYER

WHEREFORE, based on the above stated facts, Plaintiff Robert A. Marsh respectfully requests that this Honorable Court award all damages, including attorneys' fees and costs, to Plaintiff to compensate him for the injuries he suffered as a proximate result of Defendants' actions and inactions. Plaintiff also seeks an award of punitive damages to deter other similarly situated law enforcement officers from committing similar acts. Finally, Plaintiff seeks whatever equitable relief the Court deems appropriate, such as requiring Defendants to undergo additional training and

education addressing Defendants use of excessive and wrongful force, the development of policies to preclude such actions in the future, and the implementation of discipline against Defendants to hold them accountable for their wrongful actions.

**PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY.**

**ROBERT A. MARSH**, Plaintiff,

--By Counsel–

/s/ Lonnie C. Simmons
Lonnie C. Simmons (W.Va. I.D. No. 3406)
J. Timothy DiPiero (W.Va. I.D. No. 1021)
**DIPIERO SIMMONS MCGINLEY & BASTRESS, PLLC**
P.O. Box 1631
Charleston, West Virginia 25326-1631
(304) 342-0133